*423 Dissenting Opinion by
Watts, J.,
which Hotten, J., joins
Respectfully, I dissent. I would affirm the judgment of the Court of Special Appeals.
Charter schools are a relatively recent development in Maryland. In 2003, the General Assembly enacted the Public Charter School Act of 2003 and created a new Title 9 of the Education Article of the Code of Maryland. See 2003 Md. Laws 2582 (Vol. IV, Ch. 358, S.B. 75); Balt. City Bd. of Sch. Comm’rs v. City Neighbors Charter Sch., 400 Md. 324, 329, 929 A.2d 113, 116 (2007). In City Neighbors, 400 Md. at 328, 929 A.2d at 116, this Court explained:
Charter schools are in the nature of semi-autonomous public schools that operate under a contract with a State or local school board. The contract, or charter, defines how the school will be structured, staffed, managed, and funded, what programs will be offered, and how the school will operate and account for its activities.
In Maryland, the movement to establish charter schools was a long-fought battle fraught with controversy, including one involving a mandate for public funding of public charter schools. See id. at 329-31, 929 A.2d at 116-17. To that end, Md. Code Ann., Educ. (1978, 2014 Repl. Vol., 2016 Supp.) (“ED”) § 9-109 provides: “A county board [of education] shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.”[1]
The controversy over public funding of a public charter school continues to this day and is at the heart of this case. In *424 2013, following the 2011 approval of its charter, Frederick Classical Charter School, Inc, (“Frederick Classical”), Petitioner, objected to the calculation of the per pupil allocation (“PPA”) for the 2014 fiscal year made by Frederick County Board of Education (“FCBE”), also referred to as Frederick County Public Schools (“FCPS”), Respondent, because the PPA did not include funds for transportation. The Maryland State Board of Education (“the SBE”) upheld the calculation by FCPS, as did the Circuit Court for Frederick County (“the circuit court”) and the Court of Special Appeals. I would, too.
Although the majority opinion is well written, I disagree with its outcome. I would hold that: (I) the SBE did not err in upholding FCPS’s PPA calculation and in concluding that FCPS provided full commensurate funding to Frederick Classical, despite the circumstance that the calculation did not include transportation funding, because FCPS complied with Maryland law and was not required to include funding for a service that Frederick Classical was not providing its students; and (II) the SBE applied the correct standard of review to FCPS’s decision. Accordingly, I would affirm the judgment of the Court of Special Appeals, and in doing so, hold consistently with the appellate court, circuit court, and the SBE that have previously reviewed the matter.
Before delving into the background of this case and the reasons for affirming the judgment of the Court of Special Appeals, I think it useful to set forth for context some of the relevant law concerning charter schools and transportation funding. As stated above, the General Assembly created the Maryland Public Charter School Program in 2003 by enacting a new Title 9 to the Education Article. See 2003 Md. Laws 2582 (Vol. IV, Ch. 358, S.B. 75). “The general purpose of the Program is to establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students.” ED § 9-101(b).[2] ED § 9-103 *425 provides that “[t]he public chartering authority for the granting of a charter shall be a county board of education.” And, ED § 9-104 sets forth the process for applying to establish a public charter school. Funding is controlled by ED § 9-109, which, as stated above, provides: “A county board [of education] shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.”
As to transportation of students, ED § 4—120(b) provides that, with an exception not relevant here, “each county board [of education] shall arrange for the transportation of students to and from consolidated schools.” County school boards, however, are not required to provide transportation for all students who attend public schools. See ED § 7-801(b)(1) (“At its own expense, a county governing body may provide transportation for public school students in addition to the transportation provided by the State.” (Emphasis added)); ED § 7-805(a) (“A school bus may be used to transport any student who lives within the mileage limit, if a mileage limit has been established by a local board of education, and if [certain conditions are satisfied].” (Emphasis added)). ED § 5-205(a) provides that “[t]he State shall distribute grants as provided under this section to the county boards to provide transportation services for public school students and disabled children for whom transportation is to be provided under [ED] § 8-410[.]” ED § 5-205(a) also sets restrictions on that funding, providing that a county board may apply “any excess funds” “to costs of pupil transportation in subsequent [fiscal] years[,]” and expressly mandating that “[a] county board may not transfer State revenues from the student transportation category to any other category as a result of this section.”
*426 As to the SBE’s interpretation of “commensurate” funding under ED § 9-109, in its thorough opinion in this case, the SBE stated:
The Charter School Program, which became law in 2003, requires that a local board “disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.” [ ] E[D] § 9-109.
On May 26, 2006, th[e SBE] issued three revised opinions explaining the meaning of the terms “commensurate” and “disbursed” in accordance with our power to interpret State education law. Th[e SBE] stated that the word “commensurate” meant “proportionate” and that “disbursed” meant “expended.” City Neighbors Charter Sch. v. Baltimore City Bd. of Sch. Comm’rs, MSBE Op. No. 06-17 (2006). Th[e SBE] further stated that commensurate funding “includes funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, and transportation.” Id.
In order to assist local school systems, th[e SBE] provided a formula designed to result in a proportionate amount. Id. The formula takes the annual school system operating budget (including all federal, State, and local funding) divided by the September 30 enrollment count for the previous year minus two percent for reasonable central office functions to arrive at the PPA. Id. In addition, the charter school may be responsible for reimbursing the school system for the cost of any services that the county provides. Id.
A year later, in Monocacy Montessori Communities, Inc. v. Frederick County Bd. of Educ., MSBE Op. No. 06-17 (2006), th[e SBE] considered whether a different formula created by FCPS was consistent with State law and the [SBE] ’s previous opinions....
,.. [W]e explained that a school system could use a different formula so long as it resulted in a “bottom line amount of money such that th[e SBE] could conclude that the school *427 system was providing proportionate/commensurate funds to the charter school.” Id. We disagreed that the amount of funding must be “equal” because an equal PPA allocation would not take into account the value of in-kind services provided by FCPS. Id.
We next analyzed in Monocacy the formula applied by FCPS. A major difference in the FCPS formula was that it broke down the unrestricted budget in each of fifteen categories. Under the formula, no money was allocated for transportation because the charter school had agreed that it would provide for the transportation needs of its students. We noted that transportation dollars had been a part of the [SBE] ’s standard formula, but that the charter school would not be entitled to these funds if it had agreed to forgo them. After analyzing the FCPS formula in full and comparing it to our own formula, th[e SBE] concluded that FCPS needed to pay an additional $12 per pupil in order to meet the commensurate funding requirement. Id.
Thus, significantly, as gleaned from the SBE’s opinion, in Monocacy, the SBE ruled that a county board of education could use an alternative funding formula, provided that the formula resulted in a PPA that was similar to the PPA set forth in the SBE’s decision in City Neighbors, which this Court affirmed in City Neighbors, 400 Md. at 328, 929 A.2d at 115-16.
As to the facts and procedural history of the case, on April 6, 2011, FCPS approved Frederick Classical’s charter application to form the Frederick Classical Charter School (“the School”). FCPS and Frederick Classical subsequently entered into a contract, the charter, that set forth the various terms governing the School, As to school funding, Section A of Part V of the charter states:
In accordance with [ED] § 9-109 and further clarified in corresponding [SBE] Rulings, the [FCPS] shall disburse to [the School] an amount of county, [S]tate, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction. [The School] may seek and *428 receive other funds through local, [S]tate or federal government sources and/or from private sources without a reduction in its annual commensurate allocation.
Board Policy 440 Section 1.2 indicates an approved public charter school shall receive funding as determined by Maryland law, which may be comprised of discretionary funds and in-kind services. Annual funding will be made on a “per pupil” basis for student enrollment projections as identified in the application for year 1 up to a maximum of 280 students, for year 2 up to a maximum of 320 students, and year 3 and beyond up to a maximum of 560 students. Under enrollment as identified by the September 30 enrollment count may result in funding adjustments for current fiscal year.
As to transportation of students, Section H of Part II of the charter provides:
Transportation shall be the responsibility of [the School] families with the following exceptions:
1. Students who live along an established bus route that passes the School facility; and
2. Special education students with transportation on their [individualized education program]s.
If [the School] subsequently determines to provide transportation during the term of this Charter, it may contract with an approved provider for transportation services within provisions allowable under the negotiated agreement.
On June 26, 2013, FCPS provided Frederick Classical with its calculation of funding for the 2014 fiscal year, with the PPA calculated at $8,818.54, resulting in Frederick Classical receiving approximately $2.4 million for the 2014 fiscal year based on an enrollment of 280 students. On August 14, 2013, Frederick Classical submitted its budget to FCPS and, in a letter accompanying the budget, objected to FCPS’s calculation of the PPA because it did not include transportation funds. In a letter dated September 25, 2013, FCPS denied Frederick Classical’s request.
*429 On October 25, 2013, Frederick Classical appealed FCPS’s decision to the SBE. In the appeal, Frederick Classical argued that FCPS’s decision was inconsistent with ED § 9-109 and the SBE’s precedent, and requested that the SBE reverse FCPS’s decision to deny the School “commensurate funding as required under [ED] § 9-109[,]” or, alternatively, “requested] a declaratory ruling directing that [FCPS] revise its funding allocation to [the School].” Frederick Classical also asserted that, because the case involved “a dispute as to State public school law[,]” the SBE should “exercise its independent judgment” in evaluating the appeal. FCPS filed with the SBE a “Response and Motion for Summary Affirmance,” in which it “denie[d] that its decision regarding funding ... was arbitrary, unreasonable^] or illegal” and argued that it was “entitled to judgment as a matter of law.”
On May 20, 2014, the SBE issued an Opinion affirming FCPS’s decision “because it [wa]s not arbitrary, unreasonable, or illegal[,]” and “denying] the request for a declaratory ruling.”[3] As to the standard of review, the SBE stated that, because the “appeal concerned] a controversy or dispute regarding the rules and policies of a local board[,] [FCPS] ’s decision must be considered prima facie correct and upheld unless [Frederick Classical] prove[d] that [FCPS] ’s decision was arbitrary, unreasonable, or illegal.” (Citations and internal quotation marks omitted). The SBE reviewed its previous rulings concerning the allocation of money to public charter schools, and “reiterated” the following:
[C]ommensurate funding does not mean that the PPA must be exactly the same between a charter school and other public schools. The value of in-kind services provided by FCPS, for instance, can be accounted for to ensure that the [S]chool does not receive more than its equal share of funds. [Frederick Classical]’s argument—that counties must provide charter schools with a lump sum without regard to the services provided—is contrary to our ruling in Monocacy,
*430 Although transportation costs are among the funds that could be included in a PPA, this will depend on the arrangement between the local school system and the charter school. The bottom line is that a charter school is not automatically entitled to funds for services [that] it does not provide.
(Emphasis in original) (footnote omitted).
Thus, according to the SBE, the question at hand was “whether Frederick Classical was entitled to transportation funds as part of its PPA.” After reviewing the pertinent language of the charter concerning transportation of students, the SBE expressly concluded:
[A] plain reading of the Charter language indicates that [Frederick Classical] is not responsible for providing transportation. Rather, the responsibility falls on parents and the county (for students living along an established route or special education students). [Frederick Classical] seeks transportation funds, but it does not appear that [Frederick Classical] provides any transportation services. As we noted in Monocacy, if [Frederick Classical] received funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds.
The SBE affirmed FCPS’s decision, and ruled: “Taking into account transportation costs is consistent with our prior rulings. In determining a PPA, it is not arbitrary, unreasonable^] or illegal for a county to consider the actual services provided by the charter school to reach a commensurate level of funding.” The SBE also denied Frederick Classical’s request for a declaratory ruling, explaining that, “[b]ecause [the SBE] concluded that the transportation allocation was not contrary to State law and the formula used by [FCPS wa]s consistent with [the SBE’s] past rulings,” there was no reason to issue a declaratory ruling that the funding allocation was contrary to State law.
On June 18, 2014, Frederick Classical filed in the circuit court a petition for judicial review, and on February 4, 2015, *431 the circuit court issued an Order and Opinion affirming the SBE’s decision.
On March 6, 2015, Frederick Classical noted an appeal to the Court of Special Appeals. In a reported opinion, with Judge Robert A. Zarnoch writing for the Court, the Court of Special Appeals affirmed the judgment of the circuit court, holding “that the [SBE] did not err in upholding the decision of FCPS not to include transportation funding for Frederick Classical because FCPS complied with [SBE] rulings and [S]tate education law.” Frederick Classical Charter Sch., Inc, v. Frederick Cty. Bd. of Educ., 227 Md.App. 439, 443, 134 A.3d 376, 378 (2016). As to the applicable standard of review, the Court of Special Appeals concluded that, because the SBE “was deciding a matter of education policy,” its decision “deserve[d] the heightened deference accorded to it[,]” explaining that “the issues involved in this proceeding constitute an interplay between Frederick Classical’s charter, [FCPS’s] funding formula, and [SBE] decisions—matters of education policy rooted deeply in the powers of the [SBE].” Id. at 451, 134 A.3d at 383. Thereafter, Frederick Classical filed in this Court a petition for a writ of certiorari, which this Court granted. See Frederick Classical Charter Sch. v. Frederick Cty. Bd. of Educ., 448 Md. 724, 141 A.3d 135 (2016).
The parties dispute the standard of review applicable to the SBE’s decision. Frederick Classical contends that the SBE’s decision is not entitled to deference because “[n]o matters of education policy or local board policy [a]re implicated and no material facts [a]re disputed[,]” and rather, the issues in the case are “purely legal in nature” and “involve[ ] only application of unambiguous contract language and, potentially, application of State law, including judicial and [SBE] precedent.” FCPS disagrees and contends that the SBE’s decision must be given heightened deference because this case involves educational policy and because this Court has concluded that, in cases dealing with charter school funding, the SBE’s rulings are entitled to heightened, not less, deference. I agree mostly with FCPS.
*432 In Kenwood Gardens Condos., Inc, v. Whalen Props., LLC, 449 Md. 313, 324-25, 144 A.3d 647, 654-55 (2016), this Court set forth the standard of review generally applicable to an administrative agency’s decision, stating:
In reviewing the final decision of an administrative agency, ... we look through the circuit court’s and intermediate appellate court’s decisions, although applying the same standards of review, and evaluate the decision of the agency. Our scope of review is narrow and is limited to determining whether there is substantial evidence in the record as a whole to support the agency’s findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. We defer to the regulatory body’s fact-finding and inferences, provided [that] they are supported by evidence [that] a reasonable person could accept as adequately supporting a conclusion. However, if we determine that the agency’s decision is based on an erroneous conclusion of law, no deference is given to those conclusions. Even though the decision of the [administrative agency] was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was premised upon an erroneous conclusion of law.
(Citations, brackets, and internal quotation marks omitted). See also Charles Cty. Dep’t of Soc. Servs. v. Vann, 382 Md. 286, 294, 855 A.2d 313, 318 (2004) (“As a court sitting in judicial review of an administrative agency decision, ... we reevaluate the decision of the agency under the same statutory standards as would the circuit court, and we do not employ those standards to reevaluate the decision of the circuit or intermediate appellate court.” (Citations omitted)). In Gigeous v. E. Corr. Inst., 363 Md. 481, 496, 769 A.2d 912, 921 (2001), this Court further explained that “generally[,] judicial review of administrative agency action is narrow. The court’s task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency.” (Citation, brackets, emphasis, and internal quotation marks omitted). The Court of Special Appeals has also explained that an *433 appellate court “examine[s] whether the agency’s decision is in accordance with the law or whether it is arbitrary, illegal, and capricious.” Venter v. Bd. of Educ., 185 Md.App. 648, 664-65, 972 A.2d 328, 337, cert. denied, 410 Md. 561, 979 A.2d 709 (2009) (citation and internal quotation marks omitted).
As to review of decisions of the SBE specifically, in Patterson Park Pub. Charter Sch., Inc, v. Balt. Teachers Union, 399 Md. 174, 195-97, 923 A.2d 60, 73-74 (2007), this Court described in detail as follows:
The [SBE] ’s authority over the educational system is unique in the annals of administrative agencies. As “the head of the Department of Education,” it is vested with the power to determine policies and set forth bylaws, rules[,] and regulations for the administration of public schools, as well as interpret both statutory provisions of the Education Article, and its own by-laws, rules, and regulations. [ED §§ ] 2-101 and 2-205.
We noted in Board of Education for Dorchester County v. Hubbard, 305 Md. 774, 506 A.2d 625 (1986), that,
while administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency’s interpretation of a statute which it administers is entitled to weight, the paramount role of the [SBE] in interpreting the public education law sets it apart from most administrative agencies.
Id. at 790-91, 506 A.2d at 633 (footnote omitted).
We recently reviewed the authority of the [SBE] in Board of Education of Talbot County v. Heister, 392 Md. 140, 896 A.2d 342 (2006), stating:
Our cases have long made clear that the [SBE] has very broad statutory authority over the administration of the public school system in this State.
* ⅜ *
In Wilson v. Board of Educ. of Montgomery County, we noted that “[t]he totality of these provisions, quite plainly we think, invests the [SBE] with the last word on any matter concerning educational policy or the administra *434 tion of the system of public education. This has been described as ‘a visitatorial power of the most comprehensive character’.” We have had occasion to explain the scope and purpose of this visitatorial power:
We think it beyond question that the power of visitation vested in the [SBE] is one of general control and supervision; it authorizes the [SBE] to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the [SBE] ’s visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.
H* ⅝
The [SBE] ’s powers are not without limit or their exercise unreviewable.... The [SBE] may not decide finally purely legal questions, and may not exercise its powers arbitrarily or capriciously. Regarding the first listed limitation, however, we have noted, in the context of decision-making by administrative bodies generally, that “with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency.”
Id. at 152-155, 896 A.2d at 349-51 (footnote omitted) (citations omitted). See also Halsey v. Bd. of Educ. of Garrett County, 273 Md. 566, 572, 331 A.2d 306, 309 (1975) (“The [SBE] cannot be asserted to finally decide purely legal questions.”).
Thus, the decisions of the [SBE] are entitled to greater deference than those of most other administrative agencies. Heister, 392 Md. at 155, 896 A.2d at 351.
(Brackets omitted) (ellipsis and asterisks in original).
In City Neighbors, 400 Md. at 342-43, 929 A.2d at 124, this Court also discussed the standard of review applicable to a decision by the SBE, stating:
*435 [The] SBE has very broad statutory authority over the administration of the public school system in this State, that the totality of its statutory authority constitutes a visitatorial power of such comprehensive character as to invest the [SBE] with the last word on any matter concerning educational policy or the administration of the system of public education, that this power is one of general control and supervision, that it authorizes the [SBE] to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and that[,] whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the [SBE] ’s visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.
(Citation, footnotes, and internal quotation marks omitted). This Court further explained that, although “it is the courts that ultimately must decide purely legal questions, the broad statutory mandate given to [the] SBE requires that special deference be given to its interpretation of statutes that it administers." Id. at 343, 929 A.2d at 124 (citation omitted). In that regard, because of “the paramount role of the [SBE] in interpreting the public education law[, which] sets it apart from most administrative agencies[,]” the SBE’s “rulings must be given heightened, not less, deference.” Id. at 343, 929 A.2d at 125 (citation and internal quotation marks omitted).
This Court explained that the standard of review accorded to the SBE’s decisions is consistent with the principles embodied in Md. Code Regs, (“COMAR”) 13A.01.05.05, governing the SBE’s review of a local board of education’s decision, stating:
This unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05—that (1) decisions of a local board involving a local policy or a dispute regarding rules or regulations of the local board shall be considered by [the] SBE as prima facie correct, and [the] SBE will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, *436 unreasonable, or illegal, but (2) [the] SBE shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and [SBE] regulations. A local board decision will be regarded as arbitrary or unreasonable if it is contrary to sound educational poliey[,] and it will be regarded as illegal if it misconstrues the law or is an abuse of discretionary powers.
City Neighbors, 400 Md. at 343-44, 929 A.2d at 125 (emphasis in original) (brackets, internal quotation marks, and some citations omitted).
In City Neighbors, id. at 344, 929 A.2d at 125, a ease involving the interpretation of ED § 9-109, this Court determined that the following standard of review was applicable to the SBE’s decision:
In these cases, [the] SBE was construing a State statute, not a local board policy or regulation. It therefore owed little deference to the city and county board decisions, but was required to exercise its own independent judgment as to the proper interpretation of ED § 9-109, and, under our long-established jurisprudence, the courts are required to give substantial deference to the SBE interpretation, especially as that interpretation, though ultimately a legal conclusion, is laced with substantial educational policy. We give no more deference to the city and county boards’ decision than [the] SBE was required to give. It is the SBE decision that we review.
In City Neighbors, id. at 347-48, 929 A.2d at 127, this Court also explained that “heavy deference [ ] must be accorded to SBE interpretations of the public school laws, especially interpretations that go beyond purely legal determinations and affect or implement significant educational policy.” In that regard, “[s]o long as the SBE interpretation is not patently wrong, we would ordinarily defer to it.” Id. at 348, 929 A.2d at 127. And, “[t]o the extent that we desire to look further, we would apply the most relevant rules of statutory construction to determine the legislative intent, and, in that regard, may *437 consider legislative history and statutory purpose.” Id. at 348, 929 A.2d at 127 (citation omitted).
In this case, the SBE was not only construing a State statute—ED § 9-109—and the allocation of money to a public charter school, as well as Frederick Classical’s charter and the SBE’s prior opinions, but was also construing and analyzing FCPS’s funding formula or policy. In other words, this case involves not only matters of educational policy, the SBE’s interpretation of a statute that it administers, and the proper administration of the public school system in Maryland—all matters that are uniquely within the SBE’s purview—but also matters of FCPS’s policy. As such, as this Court has previously recognized, I would conclude that, under COMAR 13A.01.05.05, the SBE owed deference to FCPS’s decision, but was nevertheless required to exercise its independent judgment as to the proper interpretation of ED § 9-109. See City Neighbors, 400 Md. at 343-44, 929 A.2d at 125. This Court, in turn, is “required to give substantial deference to the SBE [statutory] interpretation, especially as that interpretation, though ultimately a legal conclusion, is laced with substantial educational policy.” Id. at 344, 929 A.2d at 125. Accordingly, in this case, I would accord heightened deference to the SBE’s “interpretations of the public school laws, especially interpretations that go beyond purely legal determinations and affect or implement significant educational policy[,]” such as the commensurate funding scheme of charter schools. Id. at 347-48, 929 A.2d at 127.1 note, however, that “it is the courts that ultimately must decide purely legal questions[.]” Id. at 343, 929 A.2d at 124.
Although I would accord heightened deference to the SBE’s decision, I would review that decision like any other administrative agency’s decision, and examine “whether the agency’s decision is in accordance with the law or whether it is arbitrary, illegal, and capricious.” Venter, 185 Md.App. at 664-65, 972 A.2d at 337 (citation and internal quotation marks omitted). To that end, “[decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion, but are arbitrary and illegal acts.” *438 Hurl v. Bd. of Educ. of Howard Cty., 107 Md.App. 286, 306, 667 A.2d 970, 980 (1996) (citations and internal quotation marks omitted). COMAR 13A.01.06.06, concerning the SBE’s review of a local board’s decision, provides additional guidance of what constitutes an arbitrary, illegal, or capricious decision. For example, a decision is arbitrary or unreasonable if “[i]t is contrary to sound educational policy” or if “[a] reasoning mind could not have reasonably reached the conclusion the local board or local superintendent reached,” COMAR 13A.01,06,05B(1), (2). A decision is illegal if, among other things, the decision “[e]xceeds the statutory authority or jurisdiction of the local board” or “[misconstrues the law[.]” COMAR 13A,01.05.05C(2), (3). Finally, in my view, the issue of the appropriate standard for appellate review is distinct from the question of whether the SBE applied the appropriate standard in reviewing FCPS’s determination.
Having discussed the applicable standard of review, from my perspective, a review of the parties’ contentions as to the merits is worthwhile to frame the issues. In sum, Frederick Classical contends that the SBE erred in ruling that Frederick Classical contractually agreed to forego the portion of its PPA that equated to FCPS’s transportation budget, and argues that the charter does not contain a provision that Frederick Classical would forego any funding. Frederick Classical asserts that withholding the funds for transportation results in a disbursement of funds to it that is non-commensurate with the amount disbursed to other public schools in the local jurisdiction. Frederick Classical maintains that the withheld funds are retained in the school system budget and “inevitably” spent on other students in the school district,
Frederick Classical contends that the SBE erred by misinterpreting its own precedent in Monocacy—by determining that it had ruled that a charter school can receive only funds that are associated with State-defined categories of services that the charter school itself provides—and then relying on that misinterpretation in its decision to deny funding to Frederick Classical. Frederick Classical asserts that Monocacy simply stands for the proposition that, if a charter school *439 decides to buy something from the local board of education, it must pay, from its PPA, the cash to make that purchase, and that the charter school cannot get both the cash and the purchase. Frederick Classical maintains that no SBE precedent requires a charter school be denied funds associated with activities that the charter school is not performing.
FCPS responds that the SBE correctly determined that FCPS’s PPA calculation was proper, because its formula resulted in an amount of money that was proportionate or commensurate with the funds accorded other public schools, and the resulting allocation was fully consistent with the SBE’s opinions in City Neighbors and Monocacy. FCPS argues that, both here and in Monocacy, the charter school agreed that it would not provide transportation services to its students, and because of the lack of transportation services, the charter school is not entitled to funding for those services. FCPS asserts that the issue in this case is not whether Frederick Classical agreed to forego certain funding, but rather whether the funding formula that was utilized violates the requirement for commensurate funding. According to FCPS, logically, if charter school students are not eligible for certain services, the charter school is not entitled to funding for those services.
FCPS contends that the ability of Frederick Classical to determine its priorities is not impacted by not receiving transportation funding because, based on the PPA received, Frederick Classical has the authority to allocate funding in whatever manner it deems appropriate, so long as it complies with Maryland law. FCPS points out that its funding formula does not result in a redistribution of funds to non-charter school students, and maintains that its transportation budget includes funds to pay for services that are actually provided, and does not include costs for students who are not transported by FCPS. In other words, according to FCPS, it is not retaining money from the budget that will be redistributed and spent on other students in the school district.
*440 In resolving the respective contentions of the parties, I would hold that the SBE did not err in upholding FCPS’s PPA calculation or in concluding that FCPS provided full commensurate funding to Frederick Classical, despite the circumstance that the calculation did not include transportation funding, because FCPS was not required to include funding for a service that Frederick Classical was not providing and complied with Maryland law in not providing funding for a nonexistent service. I would begin by examining the provisions of the charter. As to transportation, Frederick Classical agreed that “[transportation shall be the responsibility of [the School] families with the following exceptions: 1. Students who live along an established bus route that passes the School facility; and 2. Special education students with transportation on their [individualized education program]s.” (Paragraph breaks omitted). Stated otherwise, by its plain language, with the two noted exceptions, neither FCPS nor Frederick Classical provides transportation for the School’s students. The language of the charter is clear—the responsibility for transportation has been shifted from FCPS, and Frederick Classical, to Frederick Classical families. Put simply, under the provisions of the charter, Frederick Classical does not provide transportation for its students. As the SBE concluded, if Frederick Classical were to “receive[ ] funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds.” A charter school is not entitled to funds for services that it does not provide. As ED § 9-109 provides, a charter school must receive “commensurate” funding, and does not address providing funding for services a charter school does not provide. A charter school that does not provide transportation for its students is not entitled to funds for transportation simply by virtue of the circumstance that other schools in the school system do, in fact, receive funds for transportation that the schools provide.
I am unpersuaded by Frederick Classical’s contention that the SBE erred in allegedly concluding that Frederick Classical had contractually agreed to forego transportation funding. As an initial matter, the heart of the matter at hand is not *441 whether Frederick Classical has contractually forgone transportation funding, but rather whether the funding formula utilized by FCPS complied with ED § 9-109’s requirement of commensurate funding. As to that core issue, I would conclude that the SBE did not err in upholding the funding formula that FCPS utilized because that formula resulted in commensurate funding for Frederick Classical based on the services that Frederick Classical provides, and is consistent with Maryland law.
In its opinion in City Neighbors, MSBE Op. No. 05-17 at 4-5, the SBE set forth, as guidance and direction, a general formula or methodology for local boards of education to utilize in determining commensurate funding under ED § 9-109. According to the SBE, commensurate funding under ED § 9-109 means “that a public charter school receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system.” City Neighbors, MSBE Op. No. 05-17 at 3. And commensurate funding “includes funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, and transportation.” Id. at 3-4. In City Neighbors, id., the SBE did not state that commensurate funding includes funding for services for which public charter school students are not eligible. Indeed, the SBE recognized that “a charter school is a public school operating with agreed upon terms of flexibility within a public school system.” Id. at 5. And, in the guidance documents that were incorporated into the opinion, it was provided that “[t]he actual funding sources that would be provided to the school would be dependent upon the specific school’s eligibility for those restricted funds.” Stated otherwise, in its opinion in City Neighbors, the SBE plainly tied commensurate funding to inclusion of funding for services for which a charter school is eligible; ie., presumably, if a charter school is ineligible for certain services, then commensurate funding for the charter school need not include funding for those services.
*442 That such an approach was envisioned by the SBE is supported by another guidance document incorporated into the SBE’s opinion—namely, the SBE’s May 24, 2006 Technical Assistance Bulletin, which provided, at least in the context of transportation for special education students, that the charter should address such transportation, and that the charter “may include the Charter School returning to the [local school system] the portion of funds provided for transportation or the Charter School providing the transportation service for the student.” Additionally, in setting forth the formula for commensurate funding, the SBE expressly stated that
[f]or the special services that must be provided to its eligible students, the charter school must choose whether it will provide those services directly or whether those services will be provided by the school system. If the latter, the charter school must reimburse the school system the proportionate cost of those services.
City Neighbors, MSBE Op. No. 06-17 at 5. In other words, as gleaned from the Technical Assistance Bulletin and the SBE’s formula, the SBE contemplated the circumstance that a charter school would not receive funds, or would have to return funds that it had received, if it was not providing the transportation services—or any service that was required to be provided to eligible students—itself; ie., a charter school is not entitled to, or eligible for, funding for services that it is not providing. In short, nothing in the SBE’s opinion in City Neighbors leads to the conclusion that the SBE intended to require that a local board of education provide transportation funding to a charter school in all circumstances, regardless of whether the charter school actually was providing transportation services.
This Court ultimately affirmed the SBE’s decision and formula. See City Neighbors, 400 Md. at 828, 929 A.2d at 116. This Court noted that “[t]he SBE rulings allow the charter schools to negotiate for the provision of services, if they would rather have the services, for which they would be required to reimburse the county boards.” Id. at 366, 929 A.2d at 132. In other words, this Court affirmed the principle that was ex *443 pressed by the SBE that a charter school is not entitled to both the funding for certain services and the provision of those services by the local board. Extrapolating this reasoning to its logical conclusion demonstrates that a charter school is simply not authorized to receive funding for services that it does not provide.
Thereafter, in Monocacy, MSBE Op. No. 06-17 at 4-5, the SBE made clear that the formula set forth in City Neighbors is not a strict and rigid standard by which all funding determinations are to be made, and that local boards of education may utilize their own formulas so long as the formula results in commensurate funding pursuant to ED § 9-109. In that case, there was no issue as to the circumstance that the local board had provided no funding for transportation because, in the charter agreement, the charter school agreed that it, not the local board, would be responsible for providing transportation. Monocacy, MSBE Op. No. 06-17 at 6, 8-9. Indeed, the SBE acknowledged that one of the reasons accounting for the difference between the PPA derived from utilizing the local board’s formula versus the SBE’s formula was because the local board “put no money into the charter school budget for transportation” as a result of the charter agreement providing that the charter school would provide transportation; by contrast, transportation funding was included in the SBE’s calculation of the PPA, Id. at 8. The SBE recognized that, in Monocacy, the charter school had agreed, in the charter agreement, to “absorb the cost of transportation.” Id. at 10. The SBE’s conclusion in Monocacy demonstrates that the charter agreement can be determinative of whether funding for certain services is provided to a charter school. Thus, although a charter school that provides transportation to its students may be eligible to receive transportation funding as part of its PPA, a charter school that provides transportation services can agree, in a charter agreement, to absorb the cost of transportation such that the charter school will not have that funding included in its PPA.
To be sure, this case is distinguishable from Monocacy in that neither the charter school, Frederick Classical, nor the *444 local board, FCPS, is providing transportation. However, the principles that were developed in City Neighbors and Monoca-cy are equally applicable here. The charter expressly provides that Frederick Classical families—not Frederick Classical or FCPS—are responsible for transportation of students with the two exceptions delineated in the charter. And, logically, the charter mentions nothing about Frederick Classical agreeing to absorb the cost of transportation or foregoing transportation funding. This is so because Frederick Classical, in not providing transportation, has no costs related to transportation. Indeed, to provide Frederick Classical with funding for transportation services that it does not provide would result in Frederick Classical receiving more than commensurate funding because the charter school would receive funds for a nonexistent service for which there is no attendant cost, and the funds would remain available to the charter school for whatever use it deemed appropriate. In contrast, schools that provide transportation services to students and, therefore, receive funding for transportation services covering the cost of those services would necessarily have no such excess funds available for use.
Had Frederick Classical agreed to provide transportation for its students and not agreed to absorb the cost of such funding, then, Frederick Classical would be entitled to transportation funding. If, as in Monocacy, Frederick Classical had agreed to provide transportation but agreed to absorb the cost of transportation services, then Frederick Classical would not be entitled to transportation funding. Frederick Classical would also not be entitled to transportation funding if the charter provided that FCPS would provide transportation services. In this case, Frederick Classical is not entitled to transportation funding for transportation services it does not provide—services that, instead of being provided by FCPS, are being provided by Frederick Classical families. In sum, I would conclude that the SBE was correct in determining that FCPS’s decision and funding formula—which did not include transportation funding because, per the provisions of the charter, Frederick Classical was not providing transportation *445 services—is consistent with the SBE’s opinions in City Neighbors and Monocacy and this Court’s opinion in City Neighbors, and fully satisfies the requirement of ED § 9-109 for commensurate funding.
As a final matter on this issue, I point out that commensurate funding under ED § 9-109 does not mean equal funding. Indeed, in Monocacy, MSBE Op. No. 06-17 at 10, the SBE expressly rejected a charter school’s equal funding formula because utilizing that formula “results in an amount greater than a proportionate amount[,]” and, accordingly, “using such a formula does not comport with the statutory requirement for commensurate funding.” FCPS is not required to include transportation funding in Frederick Classical’s PPA simply because FCPS may provide transportation funding to other public or charter schools. Again, equal funding is not required under the statute; commensurate funding is. Indeed, to provide transportation funding to Frederick Classical—a charter school that does not provide transportation services—would lead to the exact problem that was recognized by the SBE in Monocacy—an amount greater than a proportionate amount being given to Frederick Classical. Accordingly, for all of the reasons discussed above, I would hold that the SBE did not err in upholding FCPS’s PPA calculation and in concluding that FCPS provided full commensurate funding to Frederick Classical.
Raising an issue distinct from the appropriate standard of appellate review, Frederick Classical contends that the SBE improperly deferred to FCPS and failed to exercise its independent judgment in reviewing FCPS’s decision, ie., that the SBE applied an erroneous standard of review. According to Frederick Classical, its appeal involved issues concerning the explanation and interpretation of a contract, State public school laws, and the SBE’s prior opinions, and did not involve a local policy or a dispute about FCPS’s rules and regulations; therefore, the SBE was required to exercise its independent judgment. FCPS responds that the SBE applied the correct standard of review in rendering its decision.
*446 COMAR 13A.01.05.05A, which governs the SBE’s review of decisions of a local board, provides: “Decisions of a local board involving a local policy or a controversy and dispute regarding the rules and regulations of the local board shall be considered prima facie correct, and the [SBE] may not substitute its judgment for that of thé local board unless the decision is arbitrary, unreasonable, or illegal.” COMAR 13A.01.05.05E provides: “The [SBE] shall exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws and [SBE] regulations.” As stated above, in City Neighbors, 400 Md. at 343-44, 929 A.2d at 125, this Court further explained:
This unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05—that (1) decisions of a local board involving a local policy or a dispute regarding rules or regulations of the local board shall be considered by [the] SBE as prima facie correct, and [the] SBE will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, unreasonable, or illegal, but (2) [the] SBE shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and [SBE] regulations. A local board decision will be regarded as arbitrary or unreasonable if it is contrary to sound educational policyC,] and it will be regarded as illegal if it misconstrues the law or is an abuse of discretionary powers.
(Emphasis in original) (brackets, internal quotation marks, and some citations omitted).
I would conclude that the SBE applied the correct standard of review to FCPS’s decision. Although, in its opinion, the SBE set forth the standard of review dictated by COMAR 13A.01.05.05A, and noted that the case involved “a controversy or dispute regarding the rules and policies of a local board[,]” the opinion demonstrates that, with respect to matters of State law and contract interpretation, the SBE applied its independent judgment in reviewing FCPS’s decision. Ultimately, the issue in this case involving ED § 9-109 turned on a matter of statutory and case law interpretation—a matter *447 that required the SBE to apply its independent judgment as provided by COMAR 13A.01.05.05E. In my view, that the SBE did not recite the standard from COMAR 13A.01.05.05E, in assessing issues as to the charter and State law, is of no consequence when it is evident from the SBE’s opinion that the SBE did, in fact, exercise its independent judgment in reviewing the matters. The SBE issued a comprehensive opinion, in which it reviewed the cases of City Neighbors and Monocacy, and the opinion demonstrates that the SBE was well aware that it was interpreting a matter involving the application of State law. Indeed, in its opinion, the SBE stated: “Because we concluded that the transportation allocation was not contrary to State law and the formula used by [FCPS] is consistent with our past rulings, we deny [Frederick Classical]’s request for a declaratory ruling.” There is no indication in its opinion that the SBE viewed FCPS’s decision as prima facie correct or that it was predisposed to do so.
From my perspective, Frederick Classical’s contentions concerning the standard of review applied by the SBE to FCPS’s decision are red herrings. It is clear from a review of the SBE’s opinion that, Frederick Classical’s argument notwithstanding, the SBE applied its independent judgment in concluding that FCPS’s PPA calculation was consistent with Maryland law and the SBE did not simply defer to FCPS’s determination without undertaking an independent review. I would conclude that the SBE properly assessed FCPS’s decision and correctly determined that FCPS provided full commensurate funding to Frederick Classical.
For the above reasons, I would affirm the judgment of the Court of Special Appeals. Thus, respectfully, I dissent.
Judge Hotten has authorized me to state that she joins in this opinion.

. As originally enacted in 2003, Md. Code Ann., Educ. (1978, 2001 Repl. Vol., 2003 Supp.) § 9-109 contained the above-quoted language in subsection (a) and contained a subsection (b) stating that "[t]he State Board or the county board may give surplus educational materials, supplies, furniture, and other equipment to a public charter school.” 2003 Md. Laws 2588 (Vol. IV, Ch. 358, S.B. 75). In 2015, Md. Code Arm., Educ. (1978, 2014 Repl. Vol.) § 9-109 was amended and subsection (b) was deleted, See 2015 Md. Laws 1661, 1663 (Vol. II, Ch. 311, S.B. 595).

. In City Neighbors, 400 Md. at 329, 929 A.2d at 116, this Court explained:
*425 The principal objective of those who desired to create [charter] schools—parents, educators, community groups, private entities— was to develop and implement innovative and more effective educational programs, and to do that, they needed and demanded freedom from some of the structural, operational, fiscal, and pedagogical controls that governed the traditional public school system.

. The SBE’s opinion is Frederick Classical Charter Sch., Inc, v. Frederick Cty. Bd. of Educ., MSBE Op. No. 14-21 (2014).